UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| MICHAEL WOODS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:24-cv-00821-KMB-RLY |
| | ) | |
| JACKSON Lieutenant, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff Michael Woods is an Indiana Department of Correction ("IDOC") inmate. He proceeds on an Eighth Amendment conditions of confinement claim and state-law negligence claim against Lieutenant Jackson. He also proceeds on a First Amendment free exercise claim for damages against Officer Bishop in his individual capacity and a claim for injunctive relief under the Religious Land Use and Institutionalized Persons Act ("RLUIPA") against Officer Bishop in his official capacity. Dkt. 18.

Defendants have moved for summary judgment on all of Mr. Woods's claims pending in this action. Dkt. [50]. For the reasons below, that motion is **GRANTED** as to Mr. Woods's federal constitutional claims against Defendants, and the Court relinquishes supplemental jurisdiction over Mr. Woods's state law negligence claim. Mr. Woods's motion to amend his surreply, dkt. [62], is **GRANTED** and the Court has considered his amended surreply, dkt. 62-1, in making its ruling.

## I.
## Summary Judgment Standard

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment

as a matter of law. *See* Fed. R. Civ. P. 56(a). When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572–73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). A court only has to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it need not "scour the record" for evidence that might be relevant, *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 573−74 (7th Cir. 2017) (cleaned up). Put another way, a party seeking summary judgment must inform the district court of the basis for its motion and identify the record evidence it contends demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

## II.
## Factual Background

Because Defendants have moved for summary judgment under Rule 56(a), the Court views and recites the evidence in the light most favorable to Mr. Woods and draws all reasonable inferences in his favor. *Khungar*, 985 F.3d at 572–73.

### A. Parties

Plaintiff Michael Woods is an IDOC inmate who was incarcerated at Pendleton Correctional Facility at all times relevant to his Complaint. Dkt. 1.

Defendant Johnathan Jackson was a Correctional Lieutenant, assigned to work in G-Cellhouse ("GCH"). Dkt. 51-5 at 1. Defendant Chance Bishop was a property officer in GCH. Dkt. 51-6 at 1.

**B. Plaintiff's Claims**

Mr. Woods is proceeding against Lt. Jackson on an Eighth Amendment conditions of confinement claim and a state law negligence claim based on his allegations that Lt. Jackson did not allow Mr. Woods to have a bar of soap in his cell, did not allow Mr. Woods to have a toothbrush, or toothpaste while he was on strip cell status, and that he did not have running water for eight days after he was moved to a new cell. Dkt. 18 at 3-5.

Mr. Woods is proceeding against Officer Bishop on First Amendment free exercise RLUIPA claims based on his allegation that Officer Bishop refused to return his religious materials for more than a month after he concluded strip cell status. Dkt. 18 at 3-5.

**C. Relevant Facts**

On April 24, 2023, Mr. Woods was housed in H-Cellhouse ("HCH") at Pendleton. Dkt. 51-4 at 1. On May 6, Mr. Woods threw an unknown liquid substance on a correctional officer, striking the officer in the face and chest. Dkt. 51-2. As a result of this incident, Mr. Woods was removed from HCH and placed in GCH, a segregated housing unit. *Id.*; dkt. 51-4 at 1. Mr. Woods was charged with Battery Against Staff and found guilty of the offense on June 1. Dkt. 51-3 at 2.

When he arrived in segregation at GCH on May 18, Mr. Woods was placed on strip cell status. Dkt. 51-1 at 7; dkt. 51-4 at 1; dkt. 58-1 at 6. Mr. Woods was on strip cell status for approximately thirteen days. Dkt. 51-1 at 7, 17. Mr. Woods then moved to a segregation cell in GCH, and did not receive his property for "some time," which he alleged to be 34 days in his Complaint. Dkt. 1 at 16; dkt. 51-1 at 8.

Mr. Woods's property was inventoried by correctional staff in HCH on May 5 or 6. Dkt. 51-6 at 3, 7; dkt. 59 at 2. The inventory reflects that Mr. Woods possessed items including soap, shampoo, toothpaste, a toothbrush, towels, clothing, and a Bible. *Id*.

**a. Strip Cell Conditions**

While on strip cell status, Mr. Woods did not have access to certain personal property in his cell, including hygiene materials like soap and utensils. Dkt. 51-1 at 22; dkt. 51-6 at 3. Inmates on strip cell status are not permitted to possess a toothbrush or toothpaste in their cells for safety and security reasons but can have them in their shower box to use. Dkt. 58-1 at 12. Mr. Woods was in a cell with running water, so he was able to rinse his hands with water but lacked soap. Dkt. 51-1 at 17. Mr. Woods received regular meals during his time on strip cell status. Dkt. 51-1 at 17-18. Inmates placed on strip cell status in GCH were not permitted to possess eating utensils due to safety concerns, but they were provided with utensils upon removal from strip cell status. Dkt. 51-6 at 2.

Mr. Woods testified he does not know who made the decision regarding the duration of his strip cell placement. Dkt. 51-1 at 21. Mr. Woods did not personally see Lt. Jackson deny him hygiene items or place him in a specific cell. Dkt. 51-5 at 4; dkt. 51-1 at 19, 21.

In GCH, inmates are provided with access to hygiene materials through institutional procedures, including access to a combined soap and shampoo solution during scheduled showers. Dkt. 51-5 at 4. Inmates in GCH are provided opportunities to shower multiple times per week. Dkt. 51-5 at 2; dkt. 51-6 at 4.

Mr. Woods had the opportunity to shower three times per week, where he had access to the combined soap and shampoo as well as his toothbrush and toothpaste. Dkt. 59 at 29. Inmates in

GCH can also obtain hygiene items through commissary, which was distributed on a regular basis. Dkt. 51-5 at 4; Dkt. 51-6 at 3-4.

Mr. Woods alleges that he lost a tooth and/or filling because carrots were lodged in his teeth and he could not brush his teeth as often as he desired. Dkt. 51-1 at 22; dkt. 59 at 28. Mr. Woods does not dispute that he was able to brush his teeth three times a week when he was in the shower. Dkt. 59 at 29. Mr. Woods did not speak with a dentist about the lost filling at the time and does not recall if he ever spoke with a dentist about it. Dkt. 51-1 at 18. He explained that he did have other cavities and his teeth were "rotting away." *Id*. at 22.

**b. Segregation Cell**

Mr. Woods alleges that he was without running water in his cell for eight days after he moved into the GCH segregation cell on May 18. Dkt. 51-1 at 21; dkt. 58-1 at 6. Maintenance issues in GCH, including plumbing or water functionality, are addressed through established workorder procedures and handled by maintenance staff. Dkt. 51-5 at 3. Cells in GCH were equipped with sinks that provided running water, and if a cell was identified as having a water issue, it would be designated as unavailable for use until the issue was repaired. Dkt. 51-5 at 1-2, 4; dkt. 51-6 at 4.

Lt. Jackson testified that cells in GCH were inspected by staff prior to moving an inmate into that cell to ensure essential functions, like running water, working toilet, and lights were in working order. Dkt. 51-5 at 2. He testified he would not have personally placed an inmate in a cell without running water. *Id*.

Mr. Woods testified that his segregation cell in GCH did not have running water initially. Dkt. 51-1 at 18. Mr. Woods was told that Lt. Jackson was aware of the issue and that he had put in a work order regarding the water. *Id*. at 19. It was repaired eight days later. *Id*. at 21. During

that time, Mr. Woods received meals, which included drinks. *Id.* at 18. Mr. Woods did not request drinking water from any officers during this time. *Id.* at 19.

Mr. Woods did not request medical treatment related to dehydration during the relevant timeframe and was not taken to the hospital. Dkt. 51-1 at 19, 22; dkt. 51-7; dkt. 51-8.

**c. Property**

When offenders are transferred to GCH, staff from the sending unit are responsible for assembling a care package consisting of approved property items, while remaining property is inventoried and provided to a property officer for storage and later distribution. Dkt. 51-5 at 2; dkt. 51-6 at 1-2. The care package contains items from the inmate's existing property and generally includes hygiene items, eating utensils (if not on strip cell status), and clothing. Dkt. 51-6 at 2. Lt. Jackson was not responsible for preparing offender care packages or determining what property was included in or excluded from an inmate's care package and was not personally involved in property decisions regarding Mr. Woods. Dkt. 51-5 at 3-4.

Property processing procedures in GCH include reviewing incoming property, separating permitted items, and storing non-permitted property until the offender is eligible to receive it. Dkt. 51-6 at 2-3. Property was processed on a first-come, first-served basis, and during processing, permitted property and legal materials were separated while altered or impermissible items were confiscated in accordance with institutional policy. *Id.* at 2-3. Due to a significant influx of inmates being transferred into GCH during the times at issue in this lawsuit, processing of property could be delayed. *Id.* at 3-4.

There are property restrictions in GCH, which include limitations on items available to inmates in restrictive housing, imposed for institutional safety and security purposes. Dkt. 51-5 at

3; dkt. 51-6 at 3. Once an inmate was removed from segregation, he received any remaining property that had been previously withheld or stored. Dkt. 51-6 at 3.

Religious items were subject to the same inspection process as all other property to ensure they did not contain contraband before being issued to an offender. Dkt. 51-5 at 3. Upon arrival in GCH, those items were inspected a second time by correctional staff working the unit prior to distribution, again to confirm they did not contain contraband or other prohibited materials. *Id.*

Officer Bishop was a property officer in GCH. *Id.* at 1-2.

On May 6, Mr. Woods was moved from HCH and placed in GCH, a segregated housing unit, where he was on strip cell status for thirteen days before he was moved to the segregation cell. Dkt. 51-4 at 1; dkt. 51-4 at 1. Mr. Woods did not receive his allowable property, including his Bible, right away.

Mr. Woods sent request for interview slips to Pendleton staff regarding his property. Dkt. 25-1 at 24-30. He was told on June 6 that the property officer was working on the May 1 property and his should not be too much longer since he arrived on May 6. *Id.* at 25. Mr. Woods was told by other staff members that the property should be incoming shortly on June 7 and June 11. *Id.* at 26-27.

Mr. Woods received a Bible after "some time"—alleged to be 34 days in his Complaint—in segregation, but not his other religious study materials. Dkt. 1 at 16; dkt. 51-1 at 8, 10-11. Mr. Woods did not receive his other religious study materials for the duration of his time in the segregation cell. Dkt. 58-1 at 11-12.

He was able to pray in segregation. Dkt. 51-1 at 11. Mr. Woods was not told by any Defendant that he could not practice his religion. Dkt. 51-1 at 14. Mr. Woods explained that the religious study materials at issue, a Wycliffe Bible Dictionary, Bible Commentary, New Strong's

Concordance, and Book of the Prophets, were aids to his religious practice and assisted him to study the Bible. Dkt. 59 at 5, 8-9. Mr. Woods received the religious study materials back in February 2025 when he moved out of restricted housing. Dkt. 51-1 at 14.

## III.
## Discussion

Mr. Woods is proceeding against Lt. Jackson on an Eighth Amendment conditions of confinement claim and a state law negligence claim, and against Officer Bishop on a First Amendment free exercise and injunctive relief RLUIPA claim. Dkt. 18 at 3-5.

### A. Conditions of Confinement

Under the Eighth Amendment, "prisoners cannot be confined in inhumane conditions." *Thomas v. Blackard*, 2 F.4th 716, 720 (7th Cir. 2021) (citing *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)). A conditions-of-confinement claim includes both an objective and subjective component. *Giles v. Godinez*, 914 F.3d 1040, 1051 (7th Cir. 2019). Under the objective component, a prisoner must show that the conditions were objectively serious and created "an excessive risk to his health and safety." *Id.* (cleaned up). Life's necessities include access to shelter, heat, clothing, sanitation, and hygiene items. *See Budd v. Motley*, 711 F.3d 840, 842-43 (7th Cir. 2013); *Gillis v. Litscher*, 468 F.3d 488, 493 (7th Cir. 2006). When assessing the objective severity of conditions of confinement, the Court must consider their nature, duration, and any harm caused by the conditions. *See Thomas v. Illinois*, 697 F.3d 612, 614-15 (7th Cir. 2012). Thus, short-term deprivations do not necessarily violate the Eighth Amendment. *See, e.g.*, *Lunsford v. Bennett*, 17 F.3d 1574, 1580 (7th Cir. 1994) (24-hour delay in providing hygiene items to prisoners did not violate the 8th Amendment where no evidence that cells were unusually dirty or unhealthy).

Under the subjective component, a prisoner must establish that the defendants had a culpable state of mind — that they "were subjectively aware of these conditions and refused to

take steps to correct them, showing deliberate indifference." *Thomas*, 2 F.4th at 720. Proving the subjective component is a "high hurdle" that "requires something approaching a total unconcern for the prisoner's welfare in the face of serious risks." *Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 458 (7th Cir. 2020) (internal quotations omitted). Neither "negligence [n]or even gross negligence is enough[.]" *Lee v. Young*, 533 F.3d 505, 509 (7th Cir. 2008).

"'To recover damages under § 1983, a plaintiff must establish that a defendant was personally responsible for the deprivation of a constitutional right.'" *Whitfield v. Spiller*, 76 F.4th 698, 706 (7th Cir. 2023) (quoting *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995)).

Mr. Woods alleges that Lt. Jackson subjected him to unconstitutional conditions of confinement by depriving him of hygiene products for thirteen days in the strip cell, and by then housing him in a segregation cell without running water in his cell for eight days. Dkt. 1; dkt. 18 at 3-5.

**a. Strip Cell – denial of hygiene materials for thirteen days**

Mr. Woods was placed in a strip cell for thirteen days following his assault on an officer, in which certain property restrictions were imposed. Dkt. 51-2; dkt. 51-3 at 2; dkt. 51-4 at 1. Lt. Jackson contends that he was not personally responsible for Mr. Woods being denied hygiene items in his cell during this time, relying on his affidavit stating that he was not personally responsible for preparing Mr. Woods's care package or involved in Mr. Woods's property decisions. *See* dkt. 51-5 at 3-4. Mr. Woods has not designated any evidence that would allow a reasonable jury to conclude that Lt. Jackson was responsible for the fact that he was denied hygiene

items during his time on strip cell status. Accordingly, Lt. Jackson is entitled to summary judgment on this claim.

Regardless, even if there were evidence from which a reasonable jury could conclude that Lt. Jackson was personally responsible for Mr. Woods being denied hygiene items while he was on strip cell status for 13 days, the designated evidence does not support a reasonable inference that this deprivation was an objectively serious condition under the Eighth Amendment. During this time, it is undisputed that Mr. Woods was allowed to shower three times weekly, during which he was able to use a combined soap and shampoo mixture and had access to his toothbrush and toothpaste. Dkt. 59 at 29. The Seventh Circuit Court of Appeals has repeatedly held that limiting prisoners to showering only once a week does not violate the Eighth Amendment. *See Jaros v. Illinois Dept. of Corrections*, 684 F.3d 667, 671 (7th Cir. 2012) (collecting cases). These conditions, while no doubt unpleasant, did not present a substantial risk to Mr. Woods's health or safety. *See Harris v. Fleming*, 839 F.2d 1232, 1235 (7th Cir. 1988) (placement in cockroach-infested cell without toilet paper for five days and without a toothbrush, toothpaste, or soap for ten days did not state a claim under Eighth Amendment given lack of harm).

The record does not support a reasonable conclusion that Mr. Woods needed to shower more often than other prisoners or that the showers he was permitted were somehow inadequate. There is no suggestion, for example, that he developed a rash, sores, infections, or an especially foul odor, or that his health was otherwise impacted or in danger of being impacted by the removal of his hygiene products for thirteen days. Mr. Woods does allege that he lost a tooth and/or filling during this time because carrots were lodged in his teeth and he could not brush his teeth as often as he desired. Dkt. 51-1 at 22; dkt. 59 at 28. However, Mr. Woods describes preexisting cavities and admits that he does not recall ever speaking to a dentist about the lost tooth

or filling. Dkt. 51-1 at 18, 22. That is, Mr. Woods has not designated any evidence that supports his claim that he lost the tooth or filling because he could only brush his teeth three times a week during this 13-day period, leaving him with only inadmissible lay opinion testimony about the risks created by limiting his ability to brush his teeth. *See* Fed. R. Evid. 701(c) (lay opinion testimony cannot be based on scientific, technical, or other specialized knowledge).

Mr. Woods also describes the discomfort of eating finger food with no utensils and no access to soap. But there is no suggestion that his health was impacted by this restriction, and temporary discomforts do not violate common standards of decency. *Cf. Lunsford v. Bennett*, 17 F.3d 1574, 1580 (7th Cir. 1994). Lt. Jackson is entitled to summary judgment on this claim.

Finally, even if Mr. Woods had designated sufficient evidence to allow a reasonable jury to conclude that his conditions were objectively serious enough to violate the Eighth Amendment, he has not designated any evidence that would allow a reasonable jury to conclude that Lt. Jackson was subjectively aware that the conditions he experienced created a substantial risk to Mr. Woods and refused to take steps to correct them. For example, Mr. Woods has not designated any evidence that Lt. Jackson knew that he had carrots lodged in his teeth because he could only brush his teeth three times a week or otherwise knew that the lack of hygiene items in Mr. Woods's cell created a substantial risk to his health or safety.

For all of these reasons, Lt. Jackson is entitled to summary judgment on Mr. Woods's claim related to being denied hygiene items in his cell for 13 days while he was on strip cell status. Thus, the Court grants Lt. Jackson summary judgment on that claim.

**b. Segregation Cell – denial of running water**

Mr. Woods's conditions of confinement claim with respect to denial of water in his cell for eight days fails on the objective prong. Caselaw establishes that temporary in-cell water shut-offs

do not rise to the level of a constitutional deprivation when the individual has other access to drinking water. *See, e.g.*, *Williams v. Collins, No.* 14 C 5275, 2015 WL 4572311, at *3 (N.D. Ill. July 29, 2015) ("[A] lack of running water in an inmate's cell is not a constitutional violation where the inmate has access to drinking water in other prison areas.").

It is undisputed that Mr. Woods received meals, which included drinks, during the eight days at issue. Dkt. 51-1 at 18. Mr. Woods also admitted in his deposition that he never requested drinking water from any officer during this time, let alone had that request denied. *Id*. at 19.

Mr. Woods's claim also fails on the subjective prong. There is no evidence from which a reasonable jury could infer that Lt. Jackson was deliberately indifferent to a risk to Mr. Woods's health or safety. Mr. Woods has not designated evidence that Lt. Jackson was personally responsible for placing him in the segregation cell without running water, and Lt. Jackson has testified he would not place an inmate in a cell without running water. Dkt. 51-5 at 1. Mr. Woods's only testimony regarding any personal involvement is that another staff member told Mr. Woods that Lt. Jackson had put in a work order regarding the water. Dkt. 51-1 at 19. This does not demonstrate a total unconcern for Mr. Woods's welfare; in fact, it demonstrates that Lt. Jackson took affirmative action to get the water issue repaired. *Rasho v. Jeffreys*, 22 F.4th 703, 710 (7th Cir. 2022) ("Evidence that the defendant responded reasonably to the risk, even if he was ultimately unsuccessful in preventing the harm, negates an assertion of deliberate indifference.") (citing *Farmer*, 511 U.S. at 844).

While Mr. Woods alleges he suffered various discomforts and medical conditions from thirst during this time and that his diabetes condition was exasperated, he has not designated any evidence that Lt. Jackson was aware of these medical conditions and failed to take appropriate action during the relevant eight days. Mr. Woods's medical records reveal that in May 2023, he

put in several health care requests for medical issues and medical staff responded to each one. Dkt. 51-8 at 63-68. These health care requests concerned his mental health, headaches, diarrhea, stomach pain, hand injuries, and complaints about not receiving his property and threatening to "throw shit" on officers on the range. Dkt. 51-8 at 63-68. None of the health care requests complain of dehydration or lack of access to drinking water. *Id.* In fact, Mr. Woods's medically issued diabetic diet was increased to 2200 calories (from 1800) plus snack on May 30, 2023. Dkt. 51-7 at 10-12. While Lt. Jackson recalled that Mr. Woods was diabetic, he did not recall being made aware of any medical issues Mr. Woods alleged he sustained during this timeframe from the lack of running water in his cell. Dkt. 58-1 at 1, 4.

Accordingly, Lt. Jackson is entitled to summary judgment on Mr. Woods's Eighth Amendment claims, and the Court grants Lt. Jackson's request for summary judgment on those claims.

**B. RLUIPA**

Mr. Woods's RLUIPA claim is one for injunctive relief only. Dkt. 18 at 5 ("RLUIPA does not authorize any kind of relief against public employees in their individual capacities." (citing *Nelson v. Miller,* 570 F.3d 868 (7th Cir. 2009)). It is, however, undisputed that Mr. Woods received the religious materials at issue back in February 2025 when he moved out of restrictive housing. Dkt. 51-1 at 14. Thus, his RLUIPA claim is moot and must be dismissed. *See Nelson v. Miller*, 570 F.3d 868, 882 (7th Cir. 2009) (A court's power to grant injunctive relief only survives if such relief is actually needed."), *abrogation on other grounds recognized by Jones v. Carter*, 915 F.3d 1147 (7th Cir. 2019); *United States v. Sanchez-Gomez,* 584 U.S. 381, 385–86) (2018) (federal courts lose subject matter jurisdiction if, "at any point during the proceedings," the case becomes

moot). Thus, the Defendants' Motion for Summary Judgment on Mr. Woods's RLUIPA claim is granted.

**C. First Amendment**

Mr. Woods alleges that Officer Bishop violated the First Amendment by denying him access to his Bible for 34 days after he moved into restricted housing and by denying him access to supplemental religious texts during the entirety of the time he was in segregation following his release from strip cell status. Officer Bishop argues, among other things, that he is entitled to qualified immunity.

"[Q]ualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). Although qualified immunity is an affirmative defense, plaintiff has the burden of defeating it once defendants raise it. *Archer v. Chisolm*, 870 F.3d 603, 613 (7th Cir. 2017). Thus, to overcome the defense, Plaintiff must show that: (1) Defendant violated his statutory or constitutional rights; and (2) the right was clearly established at the time of the challenged conduct. *Sabo v. Erickson*, 128 F.4th 836, 843 (7th Cir. 2025). Courts may exercise their discretion to choose which element to address first. *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)). Here, the Court addresses the second element.

To be "clearly established," a constitutional right "must have a sufficiently clear foundation in then-existing precedent." *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018). "Existing precedent must place the constitutional or statutory question beyond debate" so that "every reasonable official would understand that what he is doing is unlawful." *Sabo*, 128 F.4th at 844 (internal quotations and citations omitted).

Given this emphasis on notice, clearly established law cannot be framed at a "high level of generality." *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011). Doing so evades the crucial question of "whether the official acted reasonably in the particular circumstances that he or she faced." *Plumhoff v. Rickard,* 572 U.S. 765, 779 (2014). The right has been defined "too generally if the unlawfulness of the officer's conduct does not follow immediately from the conclusion that [the rule] was firmly established." *Sabo*, 128 F.4th at 844. "The Supreme Court's message is unmistakable: Frame the constitutional right in terms granular enough to provide fair notice because qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *Campbell v. Kallas*, 936 F.3d 536, 546 (7th Cir. 2019) (cleaned up).

Existing precedent does not have to be "directly on point" to clearly establish a right. *Id.* at 545; *but see Zorn v. Linton*, 146 S. Ct. 926, 931 (2026) (explaining that circuit court precedent establishing that a wide range of aggressive conduct might constitute excessive force did not put officer on notice that his specific conduct was unlawful). However, to meet his burden on this element, Plaintiff must "show either a reasonably analogous case that has both articulated the right at issue and applied it to a factual circumstance similar to the one at hand or that the violation was so obvious that a reasonable person necessarily would have recognized it as a violation of the law." *Leiser v. Kloth*, 933 F.3d 696, 701 (7th Cir. 2019). The failure to do so means that Plaintiff "cannot defeat" a "qualified immunity defense." *Findlay v. Lendermon*, 722 F.3d 895, 900 (7th Cir. 2013) (reversing summary judgment denial on qualified immunity grounds because plaintiff did not identify a sufficiently analogous case or explain why defendant's actions were plainly excessive).

Given the facts of this case, the Court concludes that Officer Bishop has shown that he is entitled to qualified immunity as to Mr. Woods's First Amendment claims. The First Amendment prohibits the government from imposing a "substantial burden" on a religious practice without

adequate justification. *Neely-Bey Tarik-El v. Conley*, 912 F.3d 989, 1003 (7th Cir. 2019) (First Amendment). That said, in the correctional context, even a substantial burden is "justified if it is reasonably related to a legitimate penological interest." *Id.* at 1003 (cleaned up).

In this case, the evidence taken in the light most favorable to Mr. Woods shows that Officer Bishop deprived him of his Bible for 34 days after he came into restricted housing and did not allow Mr. Woods to access his supplemental religious texts at all during his stay in segregation—only returning those texts after he was released from segregation. Officer Bishop argues that he is entitled to qualified immunity because a reasonable officer in his circumstances would not understand that his conduct was unconstitutional. Dkt. 52 at 20-24. He argues that Mr. Woods must identify precedent placing the alleged constitutional violation "beyond debate" such that every reasonable official would understand that their conduct was unlawful, and that he cannot meet that burden. *Id*. at 22.

In response, Mr. Woods only cites general caselaw explaining qualified immunity and cases that generally discuss the First Amendment in a prison context. Dkt. 59 at 36-39 (citing *Kaufman v. Pugh*, 733 F.3d 692, 696 (7th Cir. 2013); *King v. Fed. Bureau of Prisons*, 415 F.3d 634, 638 (7th Cir 2005); *Turner v. Safley*, 482 U.S. 78, 89-91 (1987)). While those cases do discuss the First Amendment in a prison context, they are not closely factually analogous to the circumstances at hand in this case. In *Turner*, the Supreme Court considered a class action brought to determine the constitutionality of a prison's mail and marriage regulations. 482 U.S. at 81. In *King*, the Seventh Circuit acknowledged that the First Amendment encompasses the right to freedom to read in the context of an inmate's computer programing book being confiscated. 415 F.3d at 638-639. In *Kaufman,* the court found that the loss of religious books that plaintiff donated to the chapel library did not impose a substantial burden on the plaintiff's ability to follow his

religious beliefs when there was no evidence that the prison intentionally lost the books and affirmed the grant of summary judgment on this claim. 733 F.3d at 699-700.

Mr. Woods has not cited a case regarding temporary deprivation of a Bible while an inmate's property is being processed upon entry to a restricted housing unit or a reasonably analogous case. Thus, Officer Bishop is entitled to summary judgment as to that claim.

Mr. Woods also has not cited a case that discusses whether a prison can deprive an inmate of access to supplemental religious texts while he is in segregation if it also allows him to have a primary religious text, like the Bible, that Mr. Woods was allowed to have while in segregation. But Officer Bishop has cited two cases that arguably would have suggested to him that it was reasonable for him to allow Mr. Woods to have a Bible but not his supplemental religious texts while in segregation. Specifically, Officer Bishop points the Court to a case where the Seventh Circuit Court of Appeals rejected a First Amendment challenge where the inmate received the requested Bible translation without the accompanying interpretive commentary. *Tarpley v. Allen County*, 312 F.3d 895, 898-99 (7th Cir. 2002). Defendants also note that the Seventh Circuit later summarized *Tarpley* as recognizing that prisons may constitutionally deny inmates supplemental religious texts while distinguishing such works from the religion's primary holy book. *Lindell v. Huibregtse*, 205 F. App'x 446, 448 (7th Cir. 2006). While the facts in *Tarpley* are not completely analogous to the facts in this case, absent any other cases to the contrary, they are similar enough to Officer Bishop's conduct such that he would not have been on notice that his actions were objectively unreasonable when he provided Mr. Woods his Bible during his entire time in segregation but not the supplemental study books.

In short, Mr. Woods has not met his burden of identifying a close factually analogous case. Mr. Woods only cited cases that generally discuss the First Amendment in a prison context. Mr.

Woods has not presented the Court with precedent relevant to whether it is a constitutional violation for a correctional officer to deprive an inmate of a Bible and religious books for 34 days while he processed the inmate's property upon entry to a restricted housing unit or to provide an inmate the Bible but not supplemental religious books while in disciplinary segregated housing.

Accordingly, Officer Bishop is entitled to qualified immunity, and the Court grants summary judgment in favor of Officer Bishop as to the First Amendment claim.

**D. Negligence**

With Mr. Woods's constitutional claims staged for dismissal, the Court has discretion whether to exercise supplemental jurisdiction over his remaining state law negligence claims. 28 U.S.C. § 1367(c) ("The district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction . . . ."); *see also Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009) ("A district court's decision whether to exercise that jurisdiction after dismissing every claim over which it had original jurisdiction is purely discretionary."). "Indeed, when the federal claims are dismissed before trial, *there is a presumption* that the court will relinquish jurisdiction over any remaining state law claims." *Dietchweiler by Dietchweiler v. Lucas*, 827 F.3d 622, 631 (7th Cir. 2016) (emphasis added).

When deciding whether to exercise supplemental jurisdiction, "'a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity.'" *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997) (internal quotation marks and quoted authority omitted). In the Seventh Circuit, "the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial." *Groce v. Eli Lilly*, 193 F.3d 496, 501 (7th Cir. 1999); *see also Sharp*

*Elecs. v. Metropolitan Life Ins.*, 578 F.3d 505, 514 (7th Cir. 2009) ("Normally, when all federal claims are dismissed before trial, the district court should relinquish jurisdiction over pendent state-law claims rather than resolving them on the merits.") (internal quotation marks and quoted authority omitted). Exceptions to the general rule exist: "(1) when the statute of limitations has run on the pendent claim, precluding the filing of a separate suit in state court; (2) substantial judicial resources have already been committed, so that sending the case to another court will cause a substantial duplication of effort; or (3) when it is absolutely clear how the pendent claims can be decided." *Davis v. Cook County*, 534 F.3d 650, 654 (7th Cir. 2008) (internal quotation marks and quoted authority).

No circumstance in this case overcomes the presumption that the Court should relinquish jurisdiction over Mr. Woods's state-law negligence claim against Lt. Jackson. The statute of limitations is not a factor. Both federal and state law toll the relevant limitations period when claims are pending in a civil action, except in limited circumstances not present here. *See* 28 U.S.C. § 1367(d); Ind. Code § 34-11-8-1; *see also Hemenway v. Peabody Coal Co.*, 159 F.3d 255, 266 (7th Cir. 1998).

The Court has not expended significant resources on the pending state-law claims. The Court does not expect that the parties' discovery and briefing efforts with respect to the state law claims will go to waste. Rather, the evidence and legal research they have uncovered should be every bit as relevant in a state-court proceeding. Finally, comity always favors allowing state courts to decide issues of state law. Having resolved all federal claims within its original jurisdiction, the Court exercises its discretion and relinquishes supplemental jurisdiction over Mr. Woods's state law claims.

## IV.
## Conclusion

Mr. Woods's motion to amend his surreply, dkt. [62], is **granted** such that the Court considered that amended surreply in making its ruling. Defendants' motion for summary judgment is **GRANTED** to the extent that the Court enters summary judgment in favor of the Defendants on all of Mr. Woods's federal claims. Dkt. [50]. Having resolved all claims within its original jurisdiction, the Court exercises its discretion and relinquishes supplemental jurisdiction over Mr. Woods's state law claims. Final judgment will issue in a separate entry.

**IT IS SO ORDERED.**

Date: 11/10/2026

Kellie M. Barr
United States Magistrate Judge
Southern District of Indiana

Distribution:

MICHAEL WOODS
911570
PENDLETON – CF
PENDLETON CORRECTIONAL FACILITY
Electronic Service Participant – Court Only

All Electronically Registered Counsel via Court's CM/ECF System